**MORE et al. v. COCKRELL et al.**

**No. 2817.**

Court of Civil Appeals of Texas. Eastland.

July 28, 1950.

Rehearing Denied Sept. 8, 1950.

Tipps & Masters, Wichita Falls, for appellants.

Dickson & Balch, Seymour, for appellees.

GRISSOM, Chief Justice.

R. L. More, Jr. and Mrs. Inez More, a widow, sued C. B. Johnson and Seth Cockrell for secret profits alleged to have been retained by them while they were plaintiffs' employees, acting in a fiduciary capacity, in the sale of their stock in the Hamlin Sand & Gravel Company and Hamlin & Northwestern Railway Company. Plaintiffs alleged they owned the stock of said corporations and that Mr. Cockrell was an attorney who had acted for R. L. More, deceased, who was the father and husband, respectively, of the plaintiffs; that in August, 1947, plaintiffs desired to sell said stock and, by reason of the familiarity of Mr. Cockrell with said corporations, they employed him to represent them "as a broker and as an attorney" in the sale of the stock; that in September, 1947, Cockrell, acting in said capacities, reported to plaintiff that there was a vacancy of the office of plant superintendent and recommended that the defendant, C. B. Johnson, be employed as such superintendent for the plaintiffs' and that, because of Cockrell's representations, plaintiffs employed Johnson as such superintendent "to act as such so long as these plaintiffs owned the stock in said corporations"; that, because Cockrell was employed "as a broker" and Johnson as plant superintendent, both owed the duty of fully divulging to plaintiffs all matters affecting the sale of said stock but said defendants failed to do so and violated their obligations to account to plaintiffs for all of the income of said businesses and the sale of said stock; that Cockrell undertook to sell the stock of the two corporations for $75,000 in cash; that he later reported that a portion of the equipment of the gravel company was leased and the property would not sell for $75,000; that Cockrell was employed as a broker, with an agreement that he was to be paid 5% of the amount received for the sale of plaintiffs' stock, plus his expenses; that, in September, 1947, Cockrell reported to plaintiffs that $54,000 was as much as the stock could be sold for and he recommended that the sale be made and the stock delivered to him as a broker "and confidential agent and attorney" for plaintiffs and that he be authorized to complete the sale; that pursuant to said request plaintiffs endorsed the stock certificates in blank and gave them to Cockrell for closing the sale for $54,000. Plaintiffs alleged that Cockrell and Johnson had theretofore reported to H. W. Snowden that all of the stock of said corporations could be bought for $71,500; that about September 22, 1947 Cockrell and Johnson met with Snowden, delivered said stock to him and received Snowden's check for $71,500 in payment for said stock; that thereafter, Cockrell reported to plaintiffs that he had sold the stock for $54,000, paid plaintiffs that amount and Johnson and Cockrell, or one of them, retained $17,500; that, thereafter, Cockrell was paid a broker's fee of $2,700 and $500 expenses; that neither Cockrell nor Johnson divulged to plaintiffs that they had "retained a secret profit of $17,500.00" of the consideration received for

the sale of such stock; that there was a conspiracy between Cockrell and Johnson to sell plaintiffs' stock for $71,500 and report only $54,000 and retain the balance as profit, although they were charged with the "fullest integrity and the highest duty to divulge all matters in connection with the sale." Plaintiffs prayed for a joint and several judgment against defendants for $20,700.

Cockrell answered that he was a minority stockholder in said corporations and plaintiffs were the majority stockholders; that, in March, 1947, R. L. More, Jr., informed him the Mores desired to sell their stock for $75,000 and asked him to attempt to sell it; that he attempted to sell said stock for said price from March 1 to August 1, 1947, and plaintiffs were fully informed of his efforts; that about August 1, 1947, he informed the Mores he could not find a purchaser at said price, whereupon, plaintiffs agreed to cut the price to $60,000 and asked Cockrell to try to sell the stock at that price; that, on September 2, 1944, he found C. B. Johnson, who agreed to purchase said stock for said amount, contingent upon delivery of good title and free of incumbrances; that on said date, with the full consent, knowledge and approval of R. L. More, Jr., a written contract for the sale and purchase of said stock to Johnson for $60,000 was entered into and Johnson attached to said contract his check for $10,000; that on said date R. L. More Jr., executed a warranty of title to Johnson and delivered same to Johnson; that on said date all of the stock of said corporations was transferred by endorsement and assigned to Johnson by all of the stockholders, subject to the payment of $60,000; that thereupon an inventory was made of the assets and physical properties of the corporations; that about the 15th of September, it was discovered that certain equipment belonging to the Gravel Company was mortgaged and that $1,000 worth of scrap iron had been sold off the premises, whereupon, Cockrell, with the consent, knowledge and approval of R. L. More, Jr., entered into a written memorandum crediting Johnson with $5,000 on the purchase price, because of said mortgage, and with $1,000 because of the sale of the scrap iron, thereby leaving a total balance of $54,000 due by Johnson on his contract to purchase said stock. That about September 22, 1947, Johnson delivered to Cockrell a cashier's check for $54,000 payable to plaintiffs; that upon the delivery of said check, Cockrell delivered all of the capital stock of said corporations to Johnson and delivered said check to R. L. More, Jr., who accepted same as full and final payment for said stock. That, thereupon, More, Jr., delivered a check to Cockrell for $3,200 in payment for his services and expenses. However, Cockrell denied plaintiffs' allegations that there was a contract whereby plaintiffs were to pay him 5% commission plus his expenses for selling said stock and alleged that said check for $3,200 was delivered to him by More voluntarily and without demand. Cockrell alleged that from the beginning of said transaction until the completion of the sale he kept R. L. More, Jr., constantly informed of his efforts; that Cockrell always acted in good faith and fully reported all the facts known to him concerning said transaction to R. L. More, Jr. He specifically denied that he reported to the plaintiffs there was a vacancy in the office of plant superintendent and recommended Johnson be employed in such capacity. He alleged that the only connection Johnson had with said plant was after the making of the contract whereby Johnson purchased the stock.

Johnson answered by alleging the making of a written contract with Cockrell for the purchase of said stock for $60,000, the consequent reduction in price by $6,000, by reason of a mortgage and the sale of scrap iron and that he paid Cockrell, as plaintiffs' agent, $54,000 for said stock.

Upon a trial to the court, judgment was rendered for defendants and plaintiffs have appealed.

Appellants' points are, in substance, (1) that the judgment was so against the overwhelming weight of the evidence as to be clearly wrong; (2) that the undisputed evidence showed appellees were the agents and employees of appellants and that they received and retained secret profits of approximately $26,000 and, therefore, the court erred in denying appellants recovery

of such secret profits; (3) that the uncontradicted evidence showed the stock was delivered by both appellees to the ultimate purchaser who paid the consideration therefor and that each of the appellees was required, by virtue of their fiduciary relationship, to account to appellants for the total consideration paid for the stock and (4) that the undisputed evidence shows that appellees acted together in effecting a sale of the stock; that the secret profits retained were traced to them and it was error for the court to refuse to require appellees to deliver the secret profits to appellants.

The court filed findings of fact which were in accord with the facts pleaded by the appellees, as heretofore indicated. The effect of said findings is that appellees did not receive any secret profits; that Cockrell, in good faith, sold the stock to Johnson and that Johnson resold the stock to Snowden. We have carefully studied the statement of facts. We are of the opinion that the evidence is sufficient to support all of the material findings. The testimony presented merely questions of fact, which were decided adversely to appellants' contentions. With reference to the allegation of employment of Johnson as superintendent, there was evidence that he was not so employed; that his connection therewith was as a purchaser of said stock prior to the closing of the deal and during an investigation of the assets of said corporations. Cockrell testified that he told More that he was selling the stock to Johnson; that he did sell to Johnson and Johnson sold to Snowden.

The judgment is affirmed.